Jerry FARRISH, Plaintiff–Appellee,

v.

MISSISSIPPI STATE PAROLE
BOARD, et al.,
Defendants–Appellants.

No. 87–4068.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1988.

Robert L. Gibbs, Asst. Atty. Gen., Edwin
L. Pittman, Atty. Gen., Jackson, Miss., for
defendants-appellants.

Carroll Rhodes, Hazlehurst, Miss., for
plaintiff-appellee.

Before WISDOM, GEE and
CAROLYN DINEEN KING *, Circuit
Judges.

CAROLYN DINEEN KING, Circuit
Judge:

Three state officials appeal from an adverse judgment in a civil rights suit concerning the denial of a Mississippi parolee's constitutional right to confront an adverse witness at a preliminary parole revocation hearing. The appellants contend that the district court erred in finding as a matter of law that a denial of procedural due process caused the parolee's unlawful detention, in denying the defense of absolute immunity to the officials involved in the revocation hearing, and in finding that the officials were not entitled to qualified immunity in this case. We conclude that the district court properly found that the parolee was entitled to relief for a procedural due process violation, but we also conclude that the officers who conducted the preliminary parole revocation hearing should receive absolute immunity. Thus we partially affirm and partially reverse the district court's judgment.

## I.

In 1981, a Mississippi court sentenced Jerry Farrish ("Farrish") to imprisonment in the custody of the Mississippi Department of Corrections following his conviction for possession of marijuana with intent to deliver. In 1982, Farrish received parole and returned to Hazlehurst, Mississippi, where police arrested him on May 18, 1984, pursuant to a warrant issued by a municipal judge.[1] Farrish was placed in the Copiah County Detention Center, and on May 21, Farrish's parole officer, Ellis Stuart, Jr. ("Stuart"), issued a paroled prisoner arrest warrant that caused Farrish to be detained

without bond. Also on May 21, Stuart gave Farrish written notice that an informal preliminary hearing would be held on May 25 to determine whether there was a reason to revoke his parole. The notice informed Farrish that he would "be allowed to be present, speak, present evidence, confront and cross-examine any witnesses" against him, that he had the right to retain a lawyer to represent him at the administrative hearing, and that the charge against him was the sale of marijuana.

Before and at the hearing, Farrish requested the presence of J.D. Mohon ("Mohon"), an individual whose statement to police provided the basis for the charge, and promised that Mohon would not be subject to risk of harm. Stuart and the preliminary hearing officer, R.W. Smith ("Smith"), informed Farrish that they lacked subpoena power, and Mohon did not voluntarily appear at the hearing. Instead, the hearing officer heard testimony from Farrish, Stuart, Hazlehurst Chief of Police Kenneth McClendon ("McClendon"), and Police Lieutenant Hal Pell. Both police officers testified about the events surrounding Farrish's arrest and about Mohon's statements. As additional evidence, Stuart submitted copies of Mohon's written statement and a lab report showing that 117 grams of marijuana were seized from Mohon.

The testimony revealed that McClendon knew Farrish and suspected him of drug dealing. On May 9, McClendon met Farrish driving away from Farrish's residence and saw an unfamiliar vehicle sitting in the driveway as if its occupants were waiting for Farrish's return. McClendon parked where he could inconspicuously observe the front of the house, and Farrish soon arrived. Shortly after Farrish entered the house, a person later identified as Mohon left carrying something in his hand. McClendon followed Mohon, arrested him for a traffic violation, searched his car, and

---

* Formerly Judge Carolyn Dineen Randall.

1. The district court's memorandum opinion states that Farrish was charged with the sale of marijuana but does not indicate whether a pros-

ecution ensued. Farrish's arrest is apparently relevant only to the extent that it justified his initial detention, which Farrish does not dispute.

found a bag of marijuana under the seat. When questioned by McClendon, Mohon stated that he bought the marijuana from Farrish for $250. A consensual search of Farrish's house when he was arrested nine days later produced no illegal drugs, but McClendon explained that Farrish anticipated his arrest.

According to Farrish, Mohon was an acquaintance introduced by a mutual friend two months earlier. Farrish testified that Mohon attempted to sell him the bag of apparently homegrown marijuana for $250. To explain his brief errand on May 9, Farrish stated that he went to pick up a repair part for his television but the repair shop was closed. Farrish admitted knowing of Mohon's arrest, but he denied anticipating his own arrest and continuing any drug-related activities. At the hearing, Farrish's attorney cross-examined each witness that appeared, but he continuously objected to the admission of Mohon's hearsay statements. The attorney also included in the hearing record a letter to Smith stating Farrish's position that, under *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the hearsay testimony should not be considered unless Mohon was presented for confrontation and cross-examination.[2] Smith overruled Farrish's objections, and at the close of the hearing, he found that there was probable cause to believe Farrish had violated the conditions of his parole and that he should be held in custody for a final revocation hearing before the Mississippi Parole Board.

Farrish subsequently filed suit in federal court, but the district court dismissed the case without prejudice because the court ruled that Farrish should first exhaust state remedies. Farrish then filed a habeas corpus petition in state court. The state court found that probable cause existed to hold Farrish pending a final parole revocation hearing, and the court denied Farrish relief but ordered that the final hearing be held before July 31, 1984. On July 17, the Mississippi Parole Board held a final revocation hearing without Mohon present and found no reasonable cause to revoke Farrish's parole. Consequently, Farrish was released under the terms of his original parole.

## II.

On October 11, 1984, Farrish filed this suit under 42 U.S.C. § 1983, alleging a violation of his constitutional right of procedural due process based on *Morrissey*.[3] Specifically, Farrish asserted that his detention for a final parole revocation hearing impermissibly rested on statements by an adverse witness who did not appear for confrontation and cross-examination at the preliminary hearing. He also alleged that Mississippi statutes and procedures that did not provide a means to subpoena witnesses for preliminary parole revocation hearings were unconstitutional. Farrish sued numerous state entities and officials, including the Mississippi State Parole Board and its members, the Mississippi Department of Corrections, members of the

2. In *Morrissey,* the Supreme Court held that the due process clause of the fourteenth amendment protects a state parolee's interest in his continued liberty. *See* 408 U.S. at 482, 92 S.Ct. at 2600. Consequently, the Court formulated requisite procedures to provide minimum due process in parole revocations. The Court outlined a two-step process. The first stage occurs when the parolee is arrested and detained and requires an informal inquiry "in the nature of a 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." *Id.* at 485, 92 S.Ct. at 2602. The hearing must be conducted by an "independent officer," and the parolee must receive notice of the hearing stating the alleged violations. *Id.* at 486–87, 92 S.Ct. at 2603.

At the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer. On request of the parolee, a person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence. However, if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination.

*Id.* at 487, 92 S.Ct. at 2603.

3. *See supra* note 2.

Mississippi Board of Corrections, Commissioner of Corrections Morris Thigpen, the state and its governor, and Parole Officers Stuart and Smith.[4] Farrish sought declaratory, injunctive, and monetary relief for himself and others similarly situated.

Farrish subsequently moved for summary judgment. With his motion, Farrish submitted copies of the record from his preliminary parole revocation hearing, a certificate from an Assistant Secretary of State for Administrative Procedures stating that no documentation of rules or regulations concerning parole revocation hearings had been filed according to state administrative law, the final judgment in Farrish's prior federal suit, the parole board's "Certificate to Continue on Parole" issued after Farrish's final revocation hearing, and an affidavit from Farrish. The defendants moved for dismissal for failure to state a claim based on immunity and responded to the summary judgment motion.[5] In ruling on these motions, the district court found as a matter of law that Farrish's constitutional right was violated at his preliminary parole revocation hearing. The court entered a summary judgment declaring the challenged statutes unconstitutional as applied in this case and enjoining state officials from denying parolees the right to subpoena, confront, and cross-examine witnesses.[6] The court also stated its view that probable cause to detain Farrish after the preliminary hearing did not exist without Mohon's hearsay statements and that Farrish was entitled to recover for his illegal confinement. The court held that the officials were entitled to assert a qualified immunity defense and that a determination of Farrish's damages and the individual liability of particular officials required a hearing.

The defendants filed a motion to reconsider in which, among other things, they argued that summary judgment was inappropriate because a factual dispute existed concerning whether there was probable cause to detain Farrish without Mohon's statements.[7] The district court denied the motion, stating in part that a dispute as to probable cause was immaterial to its finding that Farrish was denied procedural due process. In April 1986, the district court held a non-jury trial to decide the issues of liability and damages. From the trial evidence, the district court found "that Mohon's statement was required in order to support a finding of probable cause which would justify [Farrish's] being held in custody until a final revocation hearing." Accordingly, the court awarded Farrish compensatory damages for injuries caused by his confinement.

Furthermore, the district court held "that the minimum due process requirements enumerated in *Morrissey* were well established at the time of [Farrish's] hear-

4. Farrish also named Tommy Jackson, Sheriff of Copiah County, Mississippi, as the person who actually detained him. However, the district court subsequently dismissed the sheriff because he did not participate in the parole revocation process but merely acted on a facially valid arrest warrant.

5. The defendants apparently prepared a memorandum in support of their response with documentary evidence attached. Although these documents are contained in record excerpts submitted on appeal, the record fails to show that they were ever received by the district court. No stamp appears on the documents to indicate their receipt by the clerk, and the docket sheet does not reflect them. The court's memorandum opinion and order does not include them in the list of summary judgment evidence. The omitted documents included copies of Farrish's parole agreement, his paroled prisoner arrest warrant, his notice of the preliminary hearing, the state court's order de-

nying habeas relief, and an affidavit from Smith. Smith stated that he testified in the state court proceeding, that the court did not consider Mohon's statements in determining that probable cause existed for Farrish's detention, and that he would have found probable cause at the preliminary hearing even without the hearsay evidence. A copy of the state court's final order and similar testimony from Smith were later presented to the district court at trial. This evidence constitutes the only proof concerning the state court proceeding, and the order does not indicate what evidence the state court considered in finding the existence of probable cause.

6. The district court held that Mississippi and its agencies had eleventh amendment immunity and dismissed those parties from the suit.

7. In making this argument, the defendants referred to the state court's order and Smith's affidavit.

ing." The court found that neither the governor, the members of the Mississippi Board of Corrections, nor members of the Mississippi Parole Board engaged in conduct violative of Farrish's rights and, therefore, that none of those officials was personally liable.[8] The court did find, however, that Morris Thigpen ("Thigpen") as Commissioner of Corrections should have established rules and policies for conducting preliminary parole revocation hearings or advised parole officers of his statutory subpoena power. Consequently, the court found that Thigpen, Smith, and Stuart were jointly and severally liable for Farrish's damages and attorney's fees. The district court entered final judgment on January 28, 1987, and Thigpen, Smith, and Stuart timely appealed.

The appellants assert that they should receive absolute immunity in this case because the basis of their liability is their performance of a quasi-judicial function. Alternatively, the appellants contend that they were entitled to qualified immunity because this case presented a unique situation and they could not reasonably have known that an adverse witness' hearsay statements must be excluded when the witness is unavailable. Finally, the appellants argue that the district court erred in granting summary judgment because of a factual dispute concerning the existence of probable cause.[9] We address each of these issues in turn.

### III.

#### A. Absolute Immunity

The district court afforded Thigpen, Smith, and Stuart only a qualified immuni-

ty defense. In denying absolute immunity to hearing officer Smith, the court expressly relied on our decision in *Fowler v. Cross*, 635 F.2d 476, 481 (5th Cir.1981). The court's conclusion that the officials should not receive absolute immunity is a legal determination subject to our unlimited review. For the reasons below, we must disagree with the district court as to Smith and Stuart.

In earlier cases where prisoners sought to challenge parole denials, we held that parole board members are absolutely immune from suits for damages. *See Johnson v. Wells*, 566 F.2d 1016, 1018 (5th Cir. 1978); *Cruz v. Skelton*, 502 F.2d 1101, 1102 (5th Cir.1974). In *Cruz*, we stated our full agreement with the Ninth Circuit's position and quoted *Silver v. Dickson*, 403 F.2d 642, 643 (9th Cir.1968):

"In our opinion the members of the [state parole board] and other state officials are, while employed in the processing of applications for parole, performing quasi-judicial functions. They therefore have immunity from suits for damages under the Civil Rights Act, just as other public employees engaged in the performance of quasi-judicial duties."

*Cruz*, 502 F.2d at 1101. Recent cases reaffirm our view that state officials deciding whether to grant or deny parole enjoy absolute immunity while engaging in their official duties. *See Serio v. Members of Louisiana State Bd. of Pardons*, 821 F.2d 1112, 1114 (5th Cir.1987); *Hilliard v. Board of Pardons and Paroles*, 759 F.2d 1190, 1193–94 (5th Cir.1985). The Supreme

---

8. B.C. Ruth, Chairman of the Mississippi Parole Board, offered uncontradicted testimony that the Mississippi Department of Corrections is responsible for preliminary parole revocation hearings, which are conducted by corrections department employees who are not subject to the parole board's authority. In addition, the parole board prepared a booklet titled "Law, Policies and Procedures" that stated due process requirements at parole revocation hearings and specifically referred to *Morrissey*.

9. The appellants also argue that the habeas corpus proceeding in state court provided Farrish with an adequate post-deprivation remedy and cured any procedural due process violation.

We find this argument meritless. First, allowing a parolee to seek a writ of habeas corpus is significantly different from providing the pre-deprivation procedures required by *Morrissey*. Second, to the extent that a subsequent court proceeding may constitute a reasonably prompt inquiry conducted near the place of the alleged parole violation (*Morrissey*, 408 U.S. at 485, 92 S.Ct. at 2602) and otherwise satisfy *Morrissey*'s preliminary hearing requirement, the appellants did not attempt to plead or prove the state court proceeding, and the evidence presented to the district court is insufficient to enable us to evaluate such a claim. *See supra* note 5.

Court recently observed: "Although this Court has not decided whether state parole officials enjoy absolute immunity as a matter of federal law, federal appellate courts have so held." *Cleavinger v. Saxner*, 474 U.S. 193, 200–01, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985) (citing *Evans v. Dillahunty*, 711 F.2d 828, 830–31 (8th Cir.1983); *United States ex rel. Powell v. Irving*, 684 F.2d 494 (7th Cir.1982); *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir.1981)).[10] In fact, it appears that every circuit that has considered the issue has uniformly adopted this view. See, e.g., *Johnson v. Rhode Island Parole Board Members*, 815 F.2d 5 (1st Cir.1987), and cases cited therein.

▆▆▆ Having accepted quasi-judicial immunity for parole board members exercising their decision-making power, we perceive no principled distinction between de-

nying parole and revoking parole or between parole board members and other parole officials to the extent that they perform the parole board's adjudicatory function. Other courts agree. *See, e.g., id.* at 7–8; *Trotter v. Klincar*, 748 F.2d 1177, 1182–83 (7th Cir.1984); *Anderson v. Boyd*, 714 F.2d 906, 908–09 (9th Cir.1983). This result flows from the Supreme Court's "functional" approach to immunity law which focuses on the nature of the individual official's responsibilities and not on his rank, status, or location within the government. *See Cleavinger*, 474 U.S. at 201, 106 S.Ct. at 501. Utilizing this approach, the parole revocation process is indistinguishable from the initial parole process and, arguably, is even more adjudicatory in nature.[11] Similarly, an official responsible

---

**10.** In *Cleavinger*, the Supreme Court expressly distinguished members of a prison disciplinary committee, who received only qualified immunity, from parole board members:

> Neither do we equate this discipline committee membership to service upon a traditional parole board. The board is a "neutral and detached" hearing body. *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972). The parole board member has been described as an impartial professional serving essentially " 'as an arm of the sentencing judge.' " *Sellars v. Procunier*, 641 F.2d., at 1302, n. 15, quoting *Bricker v. Michigan Parole Board*, 405 F.Supp. 1340, 1345 (ED Mich.1975). And in the penalty context, the parole board is constitutionally required to provide greater due process protection than is the institution discipline committee. *Wolff v. McDonnell*, 418 U.S. [539], at 561 [94 S.Ct. 2963, 2977, 4 L.Ed.2d 935].

474 U.S. at 204, 106 S.Ct. at 502. Furthermore, the Court responded to the argument that procedural formality was not a prerequisite for absolute immunity and that the committee was sufficiently "judicial" by distinguishing the committee's procedural safeguards from those contained in federal administrative proceedings, whose participants received absolute immunity in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978):

> Under the Bureau's disciplinary policy in effect at the time of respondents' hearings, few of the procedural safeguards contained in the Administrative Procedure Act under consideration in *Butz* were present. The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was

afforded. Information presented often was hearsay and self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

474 U.S. at 206, 106 S.Ct. at 503–04. Many of the enumerated procedures are present in parole revocation hearings. *See infra* note 11.

**11.** For example, the Supreme Court prefaced its decision in *Morrissey* with a review of the function of parole in the correctional process, and concerning the revocation of parole, the Court stated:

> Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole. The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? ... This part of the decision, too, depends on facts, and therefore it is important for the board to know accurately how many and how serious the violations were.

408 U.S. at 479–80, 92 S.Ct. at 2599. Consequently, after considering the interests of both the parolee and society in having procedural safeguards for parole revocations, the Court concluded: "What is needed is an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be in-

for conducting a revocation hearing is indistinguishable from a parole board member performing that function. Therefore, under the law of this circuit, parole board members must receive absolute immunity in a suit for damages by a parolee alleging that revocation procedures violated his right to due process, and an official who, because of the organization of the government in a particular state, performs the parole board's quasi-judicial duties must enjoy the same protection.

We recognize that in *Fowler,* 635 F.2d at 481, a panel of this court stated that members of a parole commission and its employee who denied a parolee a prompt preliminary revocation hearing were entitled to raise a qualified immunity defense, citing *Williams v. Rhoden,* 629 F.2d 1099 (5th Cir.1980) and *Henzel v. Gerstein,* 608 F.2d 654 (5th Cir.1979). In *Henzel,* the court affirmed a summary judgment on qualified immunity grounds of a parolee's civil rights claim against a parole commissioner, who allegedly interfered with the parolee's business relationships by making telephone calls to obtain authorization for out-of-state business trips and to verify the legality of the business contacts. *See* 608 F.2d 658–59. We express no opinion concerning the degree of immunity due a parole official engaging in the conduct at issue in that case. In *Williams,* however, the court stated that a qualified immunity defense was available to parole commission members in a suit alleging that they repeatedly denied parole to a prisoner in retaliation for exercising federally protected rights. *See* 629 F.2d 1102–03. Although the panel did

not consider whether absolute immunity was appropriate, the application of qualified immunity in *Williams* conflicted with our earlier holdings and must be ignored because a panel is deemed without power to disregard established precedent unless a Supreme Court or *en banc* decision changes the law. *See Wilson v. Taylor,* 658 F.2d 1021, 1034–35 (5th Cir. Unit B Oct. 1981). Similarly, to the extent that *Fowler* appears inconsistent with our earlier cases (because granting and revoking parole are similarly adjudicative), we cannot follow it.[12]

■ In this case, the district court found Smith and Stuart monetarily liable for the denial of Farrish's due process right because of the manner in which they conducted his preliminary parole revocation hearing. Smith, as the hearing officer, conducted the hearing without a critical adverse witness even though Farrish requested his presence, overruled Farrish's objections to the hearsay evidence, and considered Mohon's hearsay statements in finding the existence of probable cause to detain Farrish. In other words, Smith was liable on the basis of his "judicial" activities. Stuart was responsible for presenting evidence at the preliminary hearing to show that Farrish had committed a parole violation. He failed to produce Mohon, questioned the available witnesses about Mohon's statements, and submitted a copy of Mohon's written statement to the hearing officer. In short, he served in a prosecutorial role during the revocation proceeding. The ac-

formed by an accurate knowledge of the parolee's behavior." *Id.* at 484, 92 S.Ct. at 2602. In short, the Court perceived a need for a reliable fact-finding mechanism and thus imposed procedural requirements that produce revocation hearings which, although less formal, approximate classic adjudications. *See id.* at 485–89, 92 S.Ct. at 2602–04.

Furthermore, the Court later held that in some cases, where the effectiveness of the rights guaranteed by *Morrissey* depends on the skills of a trained advocate, the state must provide counsel for indigent parolees. *See Gagnon v. Scarpelli,* 411 U.S. 778, 790, 93 S.Ct. 1756, 1763, 36 L.Ed.2d 656 (1973). In so doing, the Court recognized that introducing counsel into a revocation hearing significantly alters the nature of

the proceeding, causing the role of the hearing body to become "more akin to that of a judge at trial" and increasing the hearing body's "self-consciousness of its quasi-judicial role." *Id.* at 787–88, 93 S.Ct. at 1762.

12. In *Fowler,* the district court found that the parole commission adopted inadequate procedures to assure prompt preliminary parole revocation hearings and that its employee failed to take adequate measures to assure that a parolee would not be transferred to a state prison until he received a preliminary hearing. 635 F.2d at 479. Arguably, liability arose from administrative rather than adjudicative action by the officials, and we do not decide whether such a distinction is proper.

tivities of both officers clearly fall within the scope of the parole board's protected function, and therefore, we hold that Smith and Stuart were absolutely immune from liability in Farrish's suit for damages.[13]

■ We do not believe, however, that the above analysis mandates absolute immunity for Thigpen. Thigpen argues that the procedural due process violation, if one occurred, was the decision to deny confrontation and cross-examination and that, therefore, anyone liable for that quasi-judicial action was entitled to absolute immunity. Assuming that Thigpen's theory is correct, his conclusion is not. He did not participate in the decision, and it was not the basis of his liability in this case. The district court premised Thigpen's liability on his failure to establish adequate rules and policies for preliminary parole revocation hearings or to advise parole officers of his subpoena power. Thigpen's conduct involved administrative activities which, although they impacted on the adjudicatory process, were not an integral part of it. Thus Thigpen's role merits only qualified immunity.

In reaching our conclusion, we are mindful of the Supreme Court's cautionary approach to extending the shield of absolute immunity and the Court's admonition that the burden is on the official seeking such protection to justify it. *See Harlow v. Fitzgerald,* 457 U.S. 800, 807–08, 102 S.Ct. 2727, 2732–33, 73 L.Ed.2d 396 (1982). We can accept the proposition that executive officers, such as Smith and Stuart, who directly participate in the quasi-judicial activity of revoking parole, perform a special function that requires an absolute blanket of protection. We are not persuaded, however, that other executive officers, such as Thigpen, require such an exemption.[14]

### B. Qualified Immunity

■ Thigpen advances the alternate proposition that even under a qualified immunity theory, he cannot be liable for damages in this case. He contends that Farrish's parole revocation proceeding presented novel circumstances that he could not be expected to anticipate. His argument particularly relies on a contention that he is unable to discover a similar factual situa-

---

**13.** We note that Smith and Stuart were employees of the Mississippi Department of Corrections, but as previously stated, an official's function, rather than his title, is the determinative factor in immunity law. Although Stuart, as Farrish's parole officer, was also the "arresting" officer in the sense that he caused Farrish to be detained for the preliminary hearing, that role is not the reason for his liability in this case. Farrish does not contend that Stuart acted wrongfully by simply initiating parole revocation proceedings. In such a case, as the Supreme Court has observed, a parole officer is not "converted into a prosecutor" by deciding to recommend revocation. *Gagnon,* 411 U.S. at 785, 93 S.Ct. at 1761. This case is therefore distinguishable from cases in which a parolee or probationer has sued an officer for an allegedly unlawful arrest. *See, e.g., Griffin v. Leonard,* 821 F.2d 1124 (5th Cir.1987); *Galvan v. Garmon,* 710 F.2d 214 (5th Cir.1983). Thus our holding does not conflict with the application of qualified immunity in those cases, and we express no opinion concerning them.

We believe that our decision is supported by Supreme Court precedent that extends absolute immunity to persons who are "integral parts of the judicial process." *Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 1116, 75 L.Ed.2d 96 (1983) (police officer testifying in a criminal

trial). To the extent that Stuart was responsible for Farrish's deprivation of due process, it was because he was "functionally comparable" to a prosecutor, and thus he should receive the immunity afforded to persons in that role. *See Butz,* 438 U.S. at 516–17, 98 S.Ct. at 2915–16 (An agency attorney who presents evidence at an administrative hearing "is absolutely immune from suits based on the introduction of such evidence.") Other courts agree that absolute immunity protects all officials who participate in a parole revocation hearing. *See, e.g., Trotter v. Klincar,* 748 F.2d 1177, 1182–83 (7th Cir. 1984); *but see Harper v. Jeffries,* 808 F.2d 281, 284 (3d Cir.1986).

**14.** For example, in *Butz,* the plaintiff had sued a number of federal executive officials, claiming that they initiated an administrative proceeding against him in retaliation for his criticism of their department. 438 U.S. at 480, 98 S.Ct. at 2897. The Supreme Court afforded absolute immunity to the administrative officials who presided at agency hearings and who prosecuted agency actions because the nature of those executive officers' duties required a full exemption from liability. *See* 438 U.S. at 512–17, 98 S.Ct. at 2913–16. However, the general rule of qualified immunity remained applicable to the other defendants in the suit, such as the Secretary and Assistant Secretary of Agriculture.

tion in prior case law.[15] The district court concluded that Thigpen was liable because, although the procedural due process rights of parolees were well established and Thigpen knew that his employees conducted preliminary parole revocation hearings, he failed to adopt policies and procedures to comply with *Morrissey*. It is unclear whether Thigpen had established any procedures to govern preliminary hearings or whether he had merely adopted inadequate ones. We will assume for the purpose of argument that procedures existed which failed to provide guidance for officers facing a situation such as this one and thus that a more fact-specific inquiry is appropriate to determine whether Thigpen is qualifiedly immune in this case.

"Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official act generally turns on the 'objective legal reasonableness' of the action ..., assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The Supreme Court has fashioned this inquiry to allow the resolution of qualified immunity on a motion for summary judgment and thus to avoid exposing government officials to harassing litigation. *See Anderson*, 107 S.Ct. at 3038, 3040. Accordingly, we view the district court's determination that Thigpen did not prove his qualified immunity defense as a legal conclusion that we may freely review. The question that we must decide, therefore, is whether the right that Thigpen allegedly violated is "sufficiently clear that a reasonable official would understand that what he is doing violates that right.

This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* at 3039 (citations omitted).

The Supreme Court adopted the procedural safeguards of *Morrissey* "to assure that the finding of a parole violation will be based on verified facts." 408 U.S. at 484, 92 S.Ct. at 2602. Accordingly, the Court stated that the preliminary hearing should be conducted reasonably near the place of arrest and as promptly as possible "while information is fresh and sources are available." *Id.* at 485, 92 S.Ct. at 2602. The Court also stated: "On the request of a parolee, a person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence." *Id.* at 487, 92 S.Ct. at 2603. The only exception expressly recognized in *Morrissey* for requiring confrontation and cross-examination at the preliminary hearing was "if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed." *Id.* Clearly, the Court viewed the preliminary hearing as a tool for preserving live testimony and a parolee's right to confront his accuser as important to assure accurate findings of fact. Admittedly, the right of confrontation is conditional, but it is undisputed that the established conditions—a request by the parolee and no risk of harm to the adverse witness—were satisfied in this case.

Nevertheless, Thigpen argues that other statements in *Morrissey* create ambiguity. Specifically, the Court emphasized that the preliminary hearing is an informal proceed-

---

**15.** In addition, Thigpen argues that subpoenas had never been used for preliminary parole revocation hearings and that courts had not previously interpreted the subpoena statute to apply to these hearings. *See* Miss.Code Ann. § 47–5–33 (1972). The argument is a response to the district court's conclusion that Thigpen could have advised officers who conducted preliminary hearings of his statutory subpoena power. This determination constituted an alternative basis for Thigpen's liability, and Thigpen

challenges the sufficiency of the evidence to support it. However, because the district court found another basis of liability which Thigpen does not challenge, we need not decide whether this finding was correct. Thus we express no opinion concerning the district court's interpretation of the statute, and we do not reach the issue of whether Thigpen should have known that his statutory subpoena power could be used for preliminary hearings.

ing, and about parole revocation, the Court stated, "the process should be flexible enough to consider other evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Id.* at 489, 92 S.Ct. at 2604. Thigpen relies on these statements to support the proposition that *Morrissey* did not clearly require the exclusion of hearsay evidence at preliminary parole revocation hearings. To read statements concerning informality of procedure and rules of evidence as a license to circumvent the parolee's right of confrontation, however, is to completely ignore the letter and spirit of *Morrissey.*

The use of hearsay presents a two-fold problem: it prevents the parolee from confronting and cross-examining the declarant, and unreliable hearsay undermines the accuracy of the fact-finding process. Consequently, courts considering the admissibility of hearsay in revocation proceedings have adopted an approach which balances the parolee's interest in confronting a particular witness against the government's good cause for denying it, particularly focusing on the "indicia of reliability" of a given hearsay statement. *See, e.g., United States v. Simmons*, 812 F.2d 561, 564 (9th Cir.1987); *United States v. Bell*, 785 F.2d 640, 642–43 (8th Cir.1986); *United States v. Penn*, 721 F.2d 762, 764–65 (11th Cir. 1983). Similarly, in *United States v. Caldera*, we held, without articulating our analysis, that the introduction of a police officer's unsubstantiated testimony concerning a lab report and a field test for drugs required a new hearing "comporting more fully with [the probationer's] right to confront and cross-examine witnesses." 631 F.2d 1227, 1228 (5th Cir.1980). In short, the case law establishes that courts have not viewed *Morrissey* as ambiguous in the manner that Thigpen suggests.

This case, far from being a borderline one, presents a classic example of when the use of hearsay impermissibly violates a right to confront and cross-examine the declarant. The only evidence that Farrish committed the alleged parole violation—the sale of marijuana—was Mohon's testimony. Mohon's self-serving statements contradicted Farrish's version of the same events, and the statements were inherently unreliable because if believed, they shifted a potential conviction for drug dealing from Mohon to Farrish. In short, the question of whether Farrish sold marijuana required a credibility choice between the two witnesses. However, rather than appearing as Farrish requested, Mohon testified in a most damaging way—through the police officers. The admission of Mohon's hearsay statements effectively deprived Farrish of his right to confront the adverse witness whose information provided the basis for parole revocation in a situation where his interest in exercising that right was paramount.[16] Thus we conclude, without difficulty, that an official who failed to establish adequate policies or procedures to govern a preliminary hearing in such an elementary case should have known that his conduct violated a clearly established right.

### C. Summary Judgment

The appellants also contend that the district court committed reversible error by granting summary judgment. In reviewing a summary judgment, we apply the same standard that governs the district court's determination: "Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if when viewing the evidence most favorably to the nonmoving party, '[the evidence shows] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Russell v. Harrison*, 736 F.2d 283, 287 (5th Cir.1984) (quoting Fed.R.Civ.P. 56(c)). The appellants challenge the summary judgment on the ground that a factual dispute existed concerning whether there was probable cause to detain Farrish without Mohon's hearsay statements. In support of

---

**16.** Despite Smith's and Stuart's protestations, the violation of Farrish's right was not unavoidable because they lacked subpoena power. If they had not used Mohon's statements against Farrish, Mohon would not have been an adverse witness, and Farrish would have had no right to confront him.

their position, they argue that Smith's statement and the state court's finding to the contrary raised a factual issue. After carefully reviewing the record, we reject the appellants' contention.[17]

First, even assuming the evidence that the appellants rely on to create a factual dispute was presented to the district court in response to Farrish's motion for summary judgment,[18] it does not appear that the court resolved the probable cause issue in granting partial summary judgment. Although the memorandum opinion accompanying the summary judgment order is unclear on this point, the disputed issue was clearly irrelevant to the declaratory and injunctive relief granted in that order. The only determination that necessarily prefaced such relief was a finding that Farrish was denied procedural due process.

In addition, in a subsequent order denying the motion to reconsider, the district court clarified its earlier opinion by stating that a factual dispute concerning probable cause was immaterial to the issue decided, citing *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). There the Supreme Court stated, "the right to procedural due process is 'absolute,'" and the denial of that right is "actionable for nominal damages without proof of actual injury." *Id.* Furthermore, a different district judge, who conducted the trial and entered the final judgment, interpreted the prior orders as leaving the probable cause issue undecided because he decided the issue anew in his memorandum opinion and order. In short, the probable cause issue apparently remained unresolved by the entry of the summary judgment, and the appellants' challenge on the basis of that issue is therefore unavailing.

Second, the contested issue was relevant, if at all, only to determine the amount of Farrish's damages. To recover compensatory damages for injuries caused by his detention, the question was whether Farrish would have been detained even if a proper hearing had been held. *See id.* at 260, 98 S.Ct. at 1050. In this case, Farrish would have received a proper hearing if Mohon had been presented for confrontation and cross-examination or if Mohon's hearsay statements had not been considered at the hearing. Presumably because Mohon still had not appeared to testify, the district court made the determination of whether the outcome of the hearing would have been different by choosing the latter course: the district court excluded Mohon's hearsay statements and determined whether probable cause existed without them. Contrary to the appellants' assertion, the district court was not required to defer to Smith's later testimony concerning how he would have answered that inquiry. The appellants' premise is that a court must defer to an administrative judgment, but no such judgment in fact existed because the court was faced with a question that the hearing officer never decided. Similarly, we must reject the appellants' implicit argument that the issue had already been decided by the state court because they failed to plead or prove the state proceeding.

## IV.

For the above reasons, we AFFIRM the district court's judgment against Thigpen, REVERSE the judgment against Smith and Stuart, and REMAND the case for further proceedings consistent with this opinion. Each party shall bear its own costs.

17. However, we must raise, on our own motion, the issue of whether the district court had jurisdiction to grant injunctive relief in the summary judgment order. At the time Farrish instituted the present action, he had been reincarcerated and was no longer a parolee. Thus Farrish was not likely to suffer future injury from the allegedly illegal conduct, and he had no standing to seek the injunction requested. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–07, 103 S.Ct. 1660, 1666–68, 75 L.Ed.2d 673 (1983). Accordingly, the district court's order enjoining state officials from denying parolees in future revocations the right to confront and cross-examine witnesses must be vacated.

18. As previously stated, it does not appear that the appellants filed the state court's order and Smith's affidavit with the district court, and thus unless the record is erroneous, these documents were not before the district court. *See supra* note 5.